TODD BLANCHE
Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
JENNIFER L. WAIER
Chief Assistant United States Attorney
Chief, Criminal Division
MAXWELL K. COLL (Cal Bar No. 312651)
Assistant United States Attorney
Deputy Chief, National Security Division
1500 United States Courthouse
312 North Spring Street
Los Angeles, California 90012
Telephone: (213) 894-1785
E-mail: maxwell.coll@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ERIC CHASE SAAVEDRA,<br>Defendant. | No. CR 2:25-00035-PA<br><br><u>GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT ERIC CHASE SAAVEDRA</u> |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney's Office for the Central District of California and Assistant United States Attorney Maxwell K. Coll, hereby files its sentencing position for defendant ERIC CHASE SAAVEDRA.

This sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, the

United States Probation and Pretrial Services Office's presentence investigation report, and such further evidence and argument as the Court may permit.

Dated: September 7, 2026

Respectfully submitted,

TODD BLANCHE
Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

JENNIFER L. WAIER
Chief, Criminal Division

MAXWELL K. COLL
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendant ERIC CHASE SAAVEDRA was entrusted with extraordinary authority as a Los Angeles County Sheriff's Department detective and federal task-force officer. He abused that authority for private gain. At the direction of Adam Iza, SAAVEDRA used his access to law-enforcement information, his badge, and the powers of legitimate policing to threaten and intimidate Iza's perceived adversaries and advance Iza's personal and business interests. And defendant compounded that misconduct by concealing hundreds of thousands of dollars in income from the IRS.

When confronted with the government's investigation, defendant SAAVEDRA immediately accepted responsibility and pleaded guilty to a two-count information charging him with conspiracy against rights, in violation of 18 U.S.C. § 241, and false subscription to a tax return, in violation of 26 U.S.C. § 7206(1). His guilty pleas recognize the seriousness of that conduct, and his sentence should reflect both the substantial breach of public trust at the center of the offenses and the mitigating circumstances discussed below.

The government agrees with the Presentence Report's criminal-history calculation and most of its offense-level calculations. However, as explained below, a four-level aggravating-role enhancement applies under U.S.S.G. § 3B1.1(a), resulting in a total offense level of 20 after acceptance of responsibility. Separately, for the reasons set forth below and in the government's contemporaneously filed motion, the government seeks a five-level departure. That departure yields a corresponding offense level of 15. With a Criminal History Category of I, the resulting advisory

Guidelines range is 18 to 24 months. The government respectfully recommends a sentence of 18 months' imprisonment, followed by three years of supervised release, $90,984 in restitution to the IRS, a deferred determination of restitution as to Victims E.Z. and D.D., and a $200 special assessment.

## II. STATEMENT OF FACTS

On February 6, 2025, defendant SAAVEDRA pleaded guilty pursuant to a plea agreement to one count of conspiracy against rights, in violation of 18 U.S.C. § 241, and one count of false subscription to a tax return, in violation of 26 U.S.C. § 7206(1). (Dkts. 4, 31.) In the plea agreement and at the change-of-plea hearing, defendant agreed to the following facts:

**Defendant and Other LASD Deputies Began Working for Adam Iza**

At all times relevant to this Factual Basis, defendant ERIC CHASE SAAVEDRA ("defendant") was a sworn law enforcement officer employed by the Los Angeles County Sheriff's Department ("LASD"). Defendant was a detective assigned to LASD's Operation Safe Streets Bureau. Defendant also served as a federal task force officer assigned to the U.S. Marshals Service's Pacific Southwest Regional Fugitive Task Force. As a LASD deputy, defendant was subject to an oath of duty and rules of conduct. This oath and these rules prohibited LASD personnel from using their law enforcement status and related equipment for personal use or for non-legitimate law enforcement purposes.

By virtue of these positions, defendant had access to sensitive law enforcement databases and other confidential databases from which he could obtain personally identifiable information ("PII") regarding

individuals, including addresses, registered vehicles, and criminal backgrounds. Per LASD policy, defendant was to use these law enforcement databases for official law enforcement purposes only.

In or around 2018, when defendant was assigned to LASD's Lakewood Station, defendant got a tattoo on his left ankle of the unofficial logo of the Lakewood Station, which was a spade with the number 13 inside of it. Defendant got the tattoo after a panel of tattooed Lakewood Station members voted to approve defendant's tattoo. Defendant was the 55th person to get that tattoo.

In or around August 2021, defendant formed a company called Saavedra & Associates LLC ("Saavedra & Associates"). Saavedra & Associates provided private security services for clients and often employed active LASD deputies and law enforcement officers.

In or around August 2021, one or more LASD deputies who had recently worked security for a wealthy individual named Adam Iza ("Iza") at Iza's mansion in Bel Air told defendant that Iza was interested in procuring security-related services from defendant. Defendant met with Iza soon thereafter, and Iza engaged Saavedra & Associates to provide security services for him that same month.

Although Iza's security-related needs varied, defendant typically staffed teams of at least two security guards to accompany Iza twenty-four hours per day and seven days per week. The teams of security guards typically worked in twelve-hour shifts. Defendant recruited approximately 20 to 25 LASD deputies, as well as at least one former LASD deputy and a sibling of a LASD deputy, to work the shifts. Defendant occasionally worked the shifts himself. The LASD

deputies, including defendant, typically carried firearms while working for Iza and sometimes displayed their LASD badges.

Iza typically paid defendant and/or Saavedra & Associates approximately $100,000 per month for security-related services. Iza made the payments through a combination of wire transfers and cash payments from bank accounts associated with Iza, including bank accounts for Zort, Inc., Dream Agency, Inc., and Rise Agency, Inc.

Defendant, in turn, paid the LASD deputies and non-law enforcement officers who worked for Iza under the umbrella of Saavedra & Associates approximately $750 for each shift they worked. Defendant typically paid the security guards in cash, although he occasionally made wire transfers to them.

Defendant and Saavedra & Associates provided security-related services for Iza from in or around August 2021 until in or around March 2022, when Iza left the United States for Dubai. Defendant and Saavedra & Associates resumed providing security-related services for Iza when Iza returned to the Los Angeles area in or around July 2024. These services continued until Iza's arrest by federal agents in or around September 2024.

During the time defendant worked for Iza, defendant, Iza, and the other LASD deputies working for Iza communicated with one another using the encrypted messaging application Telegram. They did so, among other reasons, to avoid detection by law enforcement.

At all times relevant to this Factual Basis, defendant knew and understood that the Constitution and laws of the United States protect the right to be free from unreasonable searches and seizures

and the right to be free from deprivation of property without due process of law by one acting under color of law.

**Defendant Accessed Sensitive and Confidential Databases to Supply PII to Iza in Violation of LASD Policy**

Beginning in or around fall 2021, defendant regularly used his LASD credentials to access sensitive law enforcement databases and confidential databases to obtain PII for Iza, his private client. This included PII regarding people with whom Iza had personal and/or business disputes, their associates, and their family members. Defendant sometimes tasked LASD deputies working for Saavedra & Associates to secure PII for Iza, as well.

Defendant knew that he was not authorized under LASD rules to access or use such PII for non-law enforcement matters or to share it with private clients. Defendant did so because he wanted to impress Iza with his access to law enforcement information and to continue to receive lucrative business from Iza.

Defendant and other LASD deputies supplied Iza with PII relating to Victim R.C., Victim E.Z, Victim D.D., their associates, and their family members, among others. Although defendant did not always know how Iza intended to use the PII, defendant generally understood that Iza could use the PII, among other things, to locate individuals and/or property Iza wanted to take from people, and potentially to intimidate, threaten, and/or harass people and to commit crimes.

**Defendant Helped Secure a Warrant to Search Victim R.C.'s Residence Under False Pretenses**

In or around September 2021, Iza introduced defendant to Iza's associate, Individual 1, at a party at Iza's mansion in Bel Air and

said that Iza's associate had information for defendant. In Iza's presence, Individual 1 told defendant that Individual 1 knew a significant drug dealer whom Individual 1 identified as Victim R.C. Individual 1 told defendant that Victim R.C. currently sold cocaine and fentanyl and stored illegal drugs at Victim R.C.'s residence in the Los Angeles area. Later that day, defendant had a private conversation with Individual 1 during which Individual 1 repeated similar statements to defendant.

At the time Individual 1 made the statements about Victim R.C. to defendant, defendant was aware that two LASD deputies working for Iza, LASD Deputy 5 and LASD Deputy 6, had recently held a person at gunpoint in Iza's residence after which Iza forced that person to transfer money to Iza. Defendant did not know at the time that Victim R.C. was the person the two deputies held at gunpoint.

In the weeks after Iza introduced defendant to Individual 1, Iza asked defendant multiple times about a narcotics search warrant related to Victim R.C.

On or about September 24, 2021, defendant contacted a LASD narcotics detective and relayed the information he received from Individual 1. Defendant knew that supplying the information to the narcotics detective likely would cause law enforcement to investigate Victim R.C., including by securing a warrant to search Victim R.C.'s residence. Defendant contacted the narcotics detective because he wanted to please Iza and to maintain Iza's business.

Defendant deliberately concealed important information from the narcotics detective, namely, that: (a) defendant received the information through a meeting facilitated by Iza, defendant's private

client; (b) Iza was paying defendant approximately $100,000 per month via Saavedra & Associates; and (c) LASD Deputy 5 and LASD Deputy 6 had recently held a person at gunpoint in Iza's residence, after which Iza forced that person to send money to Iza. Defendant knew that the information he provided to the narcotics detective was incomplete and misleading and that any warrant based upon that information would likely be unlawful.

Sometime after on or about October 12, 2021, the narcotics detective informed defendant that law enforcement had obtained a warrant to search Victim R.C.'s residence and that officers did not find any illegal drugs inside the residence. Defendant later relayed this information to Iza.

**Defendant Falsified Information in a Search Warrant Affidavit to Secure a Warrant to Locate Victim E.Z.'s Phone**

In or around late 2021, defendant learned about a dispute between Iza and Victim E.Z. involving a laptop computer believed to contain over $100 million in cryptocurrency. Iza told defendant that he wanted to get the laptop so that he could access and convert the cryptocurrency on it. Iza initially told defendant the laptop was stolen.

In or around late 2021, Iza informed defendant that he believed Victim E.Z.'s associate, Victim D.D., may be in possession of the laptop. On or about December 15, 2021, defendant, another LASD deputy, LASD Deputy 7, Iza, and one of Iza's associates, Individual 2, traveled to Victim D.D.'s residence in Orange County to confront Victim D.D. Victim D.D. refused to open the door and spoke to the group through a window. Defendant identified himself as a law

enforcement officer, displayed his badge, and told Victim D.D. that a stolen laptop was pinging at Victim D.D.'s residence. Victim D.D. denied possessing a stolen laptop, and someone contacted the police, who arrived soon after. The police spoke with Victim D.D. and with defendant and determined that there was nothing for the police to do. Defendant, LASD Deputy 7, Iza, and Individual 2 eventually departed.

Iza and defendant continued to discuss Victim E.Z. and the laptop at various points between in or around late 2021 and early 2022. Iza told defendant that he had engaged a private investigator and had expended large sums of money to locate Victim E.Z. and the laptop, without success. Iza told defendant that he was frustrated by the lack of progress made by the private investigator. During one such conversation, defendant volunteered that he could use his position as a law enforcement officer to obtain a search warrant for GPS location information associated with Victim E.Z.'s phone. Defendant told Iza that the warrant would enable them to locate Victim E.Z. and the laptop. Defendant volunteered to secure a warrant for Victim E.Z.'s phone because defendant wanted to please Iza and to maintain Iza's business.

On or about January 6, 2022, defendant applied for and obtained a search warrant from a Los Angeles County Superior Court judge authorizing law enforcement officers to obtain GPS location information associated with several telephone numbers, including Victim E.Z.'s number. In the sworn affidavit supporting the application, defendant falsely stated that Victim E.Z.'s telephone number was associated with a suspect in a firearms investigation.

Defendant began receiving pings from the service provider for Victim E.Z.'s phone soon after the judge authorized the illegally-obtained warrant. Defendant shared the pings identifying the approximate location of Victim E.Z.'s phone with Iza. Defendant thereafter set out to locate Victim E.Z. using the pings from the service provider.

In or around early January 2022, defendant traveled to a neighborhood in Los Angeles where GPS location information showed Victim E.Z.'s phone was located. While searching the area, defendant spotted Victim E.Z. outside a residence in an apartment complex. Defendant notified Iza that he found Victim E.Z., and the two proceeded to surveil the apartment complex and residence where defendant had seen Victim E.Z. Iza later provided Victim E.Z.'s address to others, including to the private investigator Iza had engaged to locate Victim E.Z. and the laptop. The private investigator and his team then surveilled Victim E.Z. for several months.

**Defendant Created a Fake Search Warrant to Scare and Help Secure Client 1 for Saavedra & Associates**

In or around 2022, Iza informed defendant that one of Iza's associates in the Los Angeles area, Client 1, who was involved in stealing large amounts of cryptocurrency, was interested in obtaining private security. Iza told defendant that defendant and/or Saavedra & Associates could secure Client 1's business if Client 1 believed that Client 1 had something to worry about. Iza told defendant that Iza wanted to scare Client 1 and make Client 1 believe that law enforcement was investigating Client 1. Iza asked defendant to

prepare a fake search warrant naming Client 1 and stating that Client 1 was under investigation. Defendant agreed.

At Iza's direction, defendant created a fake search warrant using an official LASD template to make it appear legitimate. Defendant tailored the fake search warrant to scare Client 1 and to make Client 1 believe that Client 1 was under investigation, referencing, among other things, cryptocurrency and digital devices. When he completed the fake search warrant, defendant directed another LASD deputy, LASD Deputy 8, to print a copy of it and deliver it to Iza so that Iza could present it to Client 1.

Soon thereafter, Client 1 engaged Saavedra & Associates to provide security for Client 1. Client 1 paid defendant and/or Saavedra & Associates for security-related services through Iza, who acted as an intermediary.

**Defendant Received Unreported Income and Subscribed to False Tax Return**

Defendant and Saavedra & Associates provided security-related services and received significant income during the year 2021 that defendant failed to declare on his individual tax return. Specifically, during 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendant received unreported income of $373,146. On or about April 18, 2022, in San Bernardino County, within the Central District of California, and elsewhere, defendant made and signed a U.S. Individual Income Tax Return, Form 1040, for the calendar year 2021, that he knew contained false information as to material matters; the return contained a written declaration that the tax returns were being signed subject to the

penalties of perjury; and defendant intentionally and voluntarily violated his known duty to obey federal tax laws. As a result of such additional taxable income, there was additional income tax of approximately $104,000 due and owing to the United States of America for the calendar year 2021.

**III. USPO SENTENCING GUIDELINES CALCULATIONS**

On June 16, 2025, the United States Probation Office ("USPO") issued the PSR. (Dkt. 41.) The PSR found that the following Guidelines factors applied:

**<u>Count 1</u> (Conspiracy Against Rights)**

| | | |
|---|---|---|
| Base Offense Level | 12 | U.S.S.G. § 2H1.1(a)(2) |
| Public official and color of law | +6 | U.S.S.G. § 2H1.1(b)(1) |
| **Total Offense Level** | **<u>18</u>** | |

**<u>Count 2</u> (False Tax Return)**

| | | |
|---|---|---|
| Base Offense Level<br><br>Tax Loss between<br><br>$100,000 and $250,000 | 16 | U.S.S.G. § 2T1.1(a)(1)<br>U.S.S.G. § 2T4.1(F) |
| **Total Offense Level** | **<u>16</u>** | |

**<u>Grouping</u> / <u>Combined Offense Level (U.S.S.G. § 3D1.4)</u>**

Count One Group (offense level 18) = 1 unit

Count Two Group (offense level 16) = 1 unit

Total units: 2

Combined offense level: 20

**Total Offense Level**

| | | |
|---|---|---|
| Combined Offense Level | 20 | U.S.S.G. § 3D1.4 |
| Acceptance of Responsibility | -3 | U.S.S.G. § 3E1.1 |
| **Total Offense Level** | **17** | |

(PSR ¶¶ 53-77.) Based on a Criminal History Category of I, and a total offense level of 17, the USPO calculates the applicable Guidelines range as **24 to 30 months.** (PSR ¶ 124.)

**IV. A FOUR-LEVEL AGGRAVATING-ROLE ENHANCEMENT APPLIES UNDER U.S.S.G. § 3B1.1(a)**

A four-level enhancement applies where "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). In determining whether a defendant was an organizer or leader, courts consider, among other things, the defendant's exercise of decision-making authority, recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, participation in planning or organizing the offense, the nature and scope of the criminal activity, and the degree of control and authority exercised over others. Id. cmt. n.4. A defendant need not exercise formal hierarchical control over another participant; organizational authority is sufficient. United States v. Ingham, 486 F.3d 1068, 1075 (9th Cir. 2007). Indeed, the Ninth Circuit has explained that an organizer need possess only the "ability and influence necessary to coordinate the activities of others to achieve the desired result." United States v. Vinge, 85 F.4th 1285, 1290 (9th Cir. 2023)

(citation omitted). And there may be more than one organizer or leader of the same criminal activity. U.S.S.G. § 3B1.1 cmt. n.4.

Defendant was an organizer of the criminal conspiracy here. Defendant did not merely perform discrete favors for Iza or act as one of several equally situated deputies. Rather, defendant created and operated the structure through which Iza obtained access to a substantial network of active law enforcement officers and, ultimately, their official powers. Defendant formed Saavedra & Associates, recruited approximately 20 to 25 LASD deputies to work for Iza, staffed teams of deputies around the clock, received approximately $100,000 per month from Iza for those services, and in turn paid the deputies who worked the shifts. (PSR ¶¶ 16-21.) Defendant therefore occupied a central organizational position between Iza, who was paying for the services, and the LASD deputies whom defendant recruited and deployed.

Defendant admitted that he sometimes tasked LASD deputies working for Saavedra & Associates to obtain confidential PII for Iza (PSR ¶ 23), and that defendant and other LASD deputies thereafter supplied Iza with PII concerning Iza's adversaries, their associates, and their family members. (Id. ¶ 25.) Defendant understood that Iza could use that information to locate individuals or property he wanted to take and potentially to intimidate, threaten, harass, or commit crimes against those individuals. (Id. ¶ 25.) Defendant similarly exercised authority when, after fabricating an official-looking LASD search warrant designed to scare Client 1, defendant directed another LASD deputy to print the fraudulent warrant and deliver it to Iza for use against Client 1. (Id. ¶ 42.) Those facts

demonstrate precisely the type of organizational authority contemplated by § 3B1.1: defendant recruited other actors, coordinated their activities, assigned them tasks, and used their status and access to accomplish the criminal objectives of the civil rights conspiracy.

The criminal activity defendant organized was also "otherwise extensive," regardless of whether the Court concludes that five particular individuals satisfy the Guidelines' definition of a criminally responsible "participant." In determining whether activity is otherwise extensive, the Court considers "all persons involved during the course of the entire offense," including persons whose services were used without their knowing participation in the crime. U.S.S.G. § 3B1.1 cmt. n.3. The Ninth Circuit accordingly has held that an activity may be otherwise extensive even where fewer than five persons are criminally responsible. United States v. Leung, 35 F.3d 1402, 1406-07 (9th Cir. 1994). The inquiry is not limited to a headcount: the sophistication and overall scope of the criminal activity are also relevant. Id.; see also United States v. Rose, 20 F.3d 367, 374 (9th Cir. 1994) (considering the number of knowing participants and unwitting outsiders, the number of victims, and the financial scope of the activity).

Measured against those considerations, the criminal activity here was plainly extensive. Defendant repeatedly enlisted the powers of legitimate law enforcement and judicial process, including the services of an unwitting narcotics detective, a Superior Court judge, and the service provider that produced GPS location information pursuant to the warrant. The criminal conspiracy extended over

months, involved multiple victims and separate schemes, exploited multiple forms of governmental authority, and was undertaken in significant part to preserve an extraordinarily lucrative private business relationship.

Accordingly, because defendant was an organizer of criminal activity that was otherwise extensive, the Court should apply the four-level enhancement under § 3B1.1(a). The enhancement is independently warranted on that basis regardless of whether the Court determines that the government has established five or more criminally responsible participants.

**V. REVISED OFFENSE LEVEL**

As set forth above, application of the four-level aggravating-role adjustment increases the offense level for Count One from 18 to 22. Count Two remains at offense level 16. Under U.S.S.G. § 3D1.4, Count One therefore constitutes one unit and Count Two, which is six levels less serious, constitutes one-half unit. The resulting one-and-one-half units increase the highest offense level by one level, producing a combined offense level of **23**. After the three-level reduction for acceptance of responsibility, defendant's total offense level is **20**, which, with a Criminal History Category of I, results in an advisory Guidelines range of 33 to 41 months.

**VI. THE GOVERNMENT REQUESTS A FIVE-LEVEL DEPARTURE**

The government has filed a contemporaneous motion requesting a five-level departure.

***

After the government's requested five-level departure, the corresponding offense level is **15**, which, with a Criminal History

Category of I, results in an advisory Guidelines range of **18 to 24 months.** The government recommends a sentence of 18 months' imprisonment.

## VII. THE GOVERNMENT RECOMMENDS 18 MONTHS' IMPRISONMENT

The government respectfully recommends that defendant be sentenced to 18 months' imprisonment, followed by three years of supervised release, and a $200 special assessment. Such a sentence is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

### A. The Nature and Circumstances of the Offense

Defendant's conduct is a blight on law enforcement, and its harm extends beyond his own misconduct. Defendant has undermined public confidence in the countless officers who exercise their authority lawfully and honorably. Defendant repeatedly used the authority, access, and credibility entrusted to him as a law-enforcement officer to advance the interests of a private client and enrich himself. He accessed confidential databases for improper purposes, supplied sensitive information concerning Iza's adversaries, misused judicial process, and invoked his badge and official status in furtherance of private objectives.

Nor was defendant's misconduct confined to a single lapse in judgment. It extended over months, involved multiple victims and distinct abuses of official authority, and was motivated in significant part by defendant's desire to preserve an extraordinarily lucrative business relationship with Iza. Defendant then failed to report hundreds of thousands of dollars in income generated during

this same period. The sustained and self-interested nature of the conduct warrants a meaningful custodial sentence.

**B. Need to Afford Adequate Deterrence**

A meaningful custodial sentence is also necessary to afford adequate general deterrence. Law-enforcement officers are entrusted with extraordinary authority, access to sensitive information, and the ability to invoke governmental power in ways unavailable to ordinary citizens. Those entrusted with such authority must understand that using it for private gain carries serious consequences. That is particularly true where, as here, defendant's misconduct was repeated, financially motivated, and involved the deliberate misuse of law-enforcement databases and judicial process. General deterrence is also critical with respect to defendant's tax offense, because the federal tax system depends heavily on voluntary compliance and must impose meaningful consequences on those who deliberately conceal substantial income from the IRS.

**C. Defendant's Remorse and Mitigation**

Defendant's acceptance of responsibility weighs meaningfully in his favor. When confronted with the government's investigation, defendant promptly accepted responsibility and thereafter pleaded guilty to both offenses. He has admitted the seriousness of his conduct and has not sought to minimize his role in it. The government therefore does not seek a sentence that ignores defendant's acceptance or the mitigating circumstances presented to the Court. A sentence of 18 months' imprisonment appropriately balances those considerations against the seriousness and sustained nature of defendant's misconduct and the substantial need for general

deterrence.

**D. Need to Avoid Unwarranted Sentencing Disparities**

The sentences imposed in the related cases arising from criminal conduct performed for Iza provide useful benchmarks. On March 16, 2026, the Court sentenced LASD Deputy Michael David Coberg to 63 months' imprisonment. See United States v. Michael David Coberg, 2:25-cr-00767-PA (Dkt. 29). On July 13, 2026, the Court sentenced LASD Deputy Scott Allen Simpkins to 18 months' imprisonment. See United States v. Scott Allen Simpkins, 2:26-cr-00133-PA (Dkt. 29). And on July 20, 2026, the Court sentenced LASD Deputy David Anthony Rodriguez to 12 months' imprisonment. See United States v. David Anthony Rodriguez, 2:25-cr-00486-PA (Dkt. 50). LASD Deputy Christopher Michael Cadman is scheduled to be sentenced on September 14, 2026, and the government has recommended a sentence of 16 months' imprisonment. See United States v. Christopher Michael Cadman, 2:25-cr-00583-PA (Dkt. 38).

The Court may also consider the related prosecution of Iris Ramaya Au, who pleaded guilty to the same offense of subscribing to a false tax return, in violation of 26 U.S.C. § 7206(1), after admitting that she failed to report more than $2.6 million in income obtained through Iza's criminal activities and, among other conduct, established nominee companies and bank accounts used in connection with those activities. See United States v. Iris Ramaya Au, 2:25-cr-00140-PA (Dkt. 57). Au is scheduled to be sentenced on September 21, 2026, and the government has recommended a sentence of 18 months' imprisonment.

A sentence of 18 months appropriately accounts for the related cases while recognizing defendant's distinct role and conduct. As discussed above, defendant created and operated Saavedra & Associates, recruited approximately 20 to 25 LASD deputies, tasked deputies with obtaining confidential information for Iza, and directed another deputy to assist in carrying out the fraudulent-warrant scheme. His misconduct extended over months, involved multiple victims and distinct abuses of law-enforcement authority, and was accompanied by a separate tax offense involving hundreds of thousands of dollars in unreported income. At the same time, defendant presents materially different mitigating circumstances that warrant a substantial reduction from the otherwise applicable Guidelines range, as addressed in the government's separately filed departure motion.

Considered together, those aggravating and mitigating circumstances support a sentence equal to that imposed on Simpkins, above the sentence imposed on Rodriguez and the sentence the government has recommended for Cadman, and well below the 63-month sentence imposed on Coberg, who operated independently of Saavedra & Associates, served as a consultant directly to Iza, and pleaded guilty to conspiracy to commit Hobbs Act extortion.

## VIII. RESTITUTION AND VICTIM IMPACT STATEMENTS

While defendant SAAVEDRA signed and executed IRS closing agreements, he has not yet satisfied his outstanding tax liability to the IRS. The government thus requests that the sentence include a restitution order of $90,984 payable to the IRS. This amount is the

tax and penalties owed for the calendar year 2021, which defendant agreed to in the closing agreements.

The government is continuing to work with Victims E.Z. and D.D. to ascertain additional losses for which restitution may be appropriate. Because those losses are not presently ascertainable, the government requests that the Court defer final determination of restitution as to those victims pursuant to 18 U.S.C. § 3664(d)(5) and set a date for the final determination of those losses within 90 days after sentencing.

Additionally, the government has contemporaneously filed under seal the victim impact statements of Victims E.Z. and D.D.

**IX. CONCLUSION**

For the foregoing reasons, the government recommends that the Court sentence defendant to 18 months' imprisonment and three years of supervised release, order restitution of $90,984 to the IRS, defer final determination of restitution as to Victims E.Z. and D.D., and impose a $200 special assessment.