Brian N. Gurwitz (State Bar No. 171862)
The Law Office of Brian Gurwitz, APC
1422 Edinger Avenue, Suite 100
Tustin, California 92780
Phone: (714) 880-8800
Fax: (714) 880-8801
Brian@gurwitzlaw.com

Attorney for Defendant Eric Chase Saavedra

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **United States of America,**<br>Plaintiff,<br>vs.<br>**Eric Chase Saavedra,**<br>Defendant. | No. 2:25-CR-00035-PA-1<br>**Defendant's Supplemental Sentencing Position Re: Government's Request for a Four-Level Aggravating-Role Adjustment Under § 3B1.1(a)**<br>Sentencing Date: September 28, 2026<br>Sentencing Time: 8:30 a.m.<br>The Hon. Percy Anderson |

## Introduction

The defense filed its sentencing position on behalf of Eric Chase Saavedra on September 7, 2026. (ECF 61.) This supplemental brief addresses a single issue raised for the first time in the government's sentencing position filed later that day: its request for a four-level aggravating-role adjustment under U.S.S.G. § 3B1.1(a). (ECF 62 at 12–15.) The PSR made no such a finding. Indeed, it expressly found – twice – that it should not apply here. PSR ¶¶ 57, 65. The government has expressed to counsel that it would not object to this supplemental brief.

Mr. Saavedra does not dispute any fact in the factual basis he signed. He does not ask the Court to read those facts charitably, and this brief does not attempt it. He formed a company that worked for a criminal client and paid deputies out of that client's money. He ran law enforcement databases for that client. He gave a

narcotics detective information he knew was incomplete and misleading. He swore a false affidavit to a Superior Court judge. He fabricated a search warrant on an official Department template. He hid $373,146 from the Internal Revenue Service. None of that is contested, and the defense recognizes that he will be sentenced for all of it.

The objection that follows is a legal one, and its limits should be stated plainly at the outset. It is not a claim that Mr. Saavedra was a minor or minimal participant. It is not a request for a mitigating-role adjustment. It is not an argument that his conduct was less serious than the government describes. It is an argument about what § 3B1.1(a) measures.

What that guideline measures is not the *gravity* of the offense. It measures one thing: whether the defendant organized or led other people who were themselves criminally responsible for "the offense" for which the defendant is sentenced. The government asks the Court to reach the opposite conclusion set forth in the PSR – on the same record available to Probation, and (as the government has represented to the defense) without the introduction of additional evidence at the sentencing hearing.

Two independent reasons support the Probation Officer's conclusion. First, § 3B1.1 requires that the defendant have been the organizer or leader of at least one criminally responsible participant, and the factual basis does not establish that any other deputy acted with the knowledge that would make him one. Second, what the government's brief describes as the organization Mr. Saavedra built is a private security company. Staffing bodyguard shifts is lawful. The criminal activity in this case is a much smaller thing, and it consists almost entirely of acts Mr. Saavedra committed personally.

The defense maintains the sentencing request set out in its principal filing, and addresses in Section 8 how the correct guidelines calculation should impact the sentencing in this case.

## Argument

### 1. The Probation Officer considered this adjustment on the same record now before the Court and found that it did not apply.

The Presentence Report addresses role in the offense twice and reaches the same conclusion each time: "Adjustment for Role in the Offense: None." PSR ¶¶ 57, 65. That was not an oversight.

The record on which that determination rests has not changed. The Probation Officer drew the offense conduct from "the Information; the Plea Agreement; and information provided by defense counsel," PSR ¶ 12, and recorded in a footnote that as of submission the office "has not received discovery from the AUSA nor the Case Agent." PSR ¶ 12 n.1. The government's sentencing position adds no facts. Its statement of facts is the factual basis of the plea agreement, reproduced. Compare Gov. Sentencing position, ECF 62 at 2–11, with the Plea Agreement, ECF 2. Every paragraph of the PSR the government cites in support of the adjustment — ¶¶ 16–21, 23, 25, and 42 — is itself a restatement of that same factual basis.

The Court is therefore not being asked to resolve a factual dispute with conflicting evidence. It is being asked whether a stipulated set of facts satisfies a legal standard. On that question the Probation Officer has already answered, and the defense submits the answer was correct.

### 2. Section 3B1.1(a) requires that the defendant have organized or led at least one criminally responsible participant, and the "otherwise extensive" clause does not dispense with that requirement.

Section 3B1.1(a) has two requirements, and they are independent of one another.

The first concerns scope. The criminal activity must have "involved five or more participants or [have been] otherwise extensive." The "otherwise extensive" clause is an alternative route to satisfying that numerical threshold, and Application Note 3 permits the court to count "all persons involved during the course of the entire offense," including unwitting outsiders.

The second concerns role, and it is governed by Application Note 2: "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." A "participant," in turn, is defined by Application Note 1 as "a person who is criminally responsible for *the commission of the offense*." Emphasis added. A person who is not criminally responsible for the commission of the offense is not a participant, and the Ninth Circuit has said so directly. *United States v. Cyphers*, 130 F.3d 1361, 1363 (9th Cir. 1997) ("[M]ere unknowing facilitators of crimes will not be considered criminally responsible participants.").

The consequence is that "otherwise extensive" relieves the government of proving five participants. It does not relieve the government of proving the defendant's leadership role over one or more others who share culpability for the commission of the offense.

The Ninth Circuit has reversed a § 3B1.1(a) adjustment on precisely that ground. In *United States v. Luca*, 183 F.3d 1018 (9th Cir. 1999), the district court applied the four-level adjustment on an "otherwise extensive" theory, found that the fraud had involved "a whole host of entities and people, wittingly and unwittingly," and expressly declined to identify any participant the defendant had organized or led. The Court of Appeals held that imposing the adjustment without identifying another participant "constituted legal error," relying on Application Note 2, on *United States v. Anderson*, 942 F.2d 606, 615 (9th Cir. 1991) (en banc), and on *United States v. Avila*, 95 F.3d 887, 889 (9th Cir. 1996), which requires "evidence

that the defendant exercised some control over others involved in the commission of the offense or was responsible for organizing others for the purpose of carrying out the crime." *Luca*, 183 F.3d at 1024.

The government's brief closes its role section by asking the Court to apply the adjustment "regardless of whether the Court determines that the government has established five or more criminally responsible participants." (ECF 62 at 14.) Under *Luca* that is not the law. The brief cites Application Notes 3 and 4. It does not cite Application Note 2, and it does not identify by name or description a single criminally responsible person Mr. Saavedra organized or led with respect to the commission of the offense at issue.

The authorities the government does cite are consistent with this. *United States v. Ingham*, 486 F.3d 1068, 1075 (9th Cir. 2007), holds that the *Avila* test is disjunctive — control over others *or* organizational authority will do. But the second prong of the disjunctive test still requires proof that exercised organizational authority "for the purpose of carrying out the crime." *Ingham*, 486 F.3d 1074. *Ingham* does not permit the enhancement to be applied simply because the defendant led an organization where members committed both lawful and unlawful acts, when the evidence does not establish that the organizational authority was used to facilitate the offense for which the defendant is being sentenced. Similarly, *United States v. Vinge*, 85 F.4th 1285 (9th Cir. 2023), on which the government relies for the proposition that an organizer needs only "the ability and influence necessary to coordinate the activities of others," was a subsection (c) case involving a drug distribution conspiracy in which the coordinated others were themselves traffickers. In other words, the defendant in that case undoubtedly served as an organizer for the sole purpose of carrying out the drug trafficking conspiracy the defendant was convicted of committing.

Also inapplicable here is *United States v. Rose*, 20 F.3d 367 (9th Cir. 1994), which the government cites for extensiveness. The presentence report in that case found that the defendant "supervised a criminally responsible party" *in addition to* employing sixty people who assisted knowingly or unknowingly. *Id.* at 374. The case the government relies on contained exactly the finding this record lacks — i.e., the identity of a culpable person who assisted the defendant in the commission of the offense. Moreover, it was reviewed only for plain error, because the defendant had not objected.

**3. The agreed factual basis does not establish that any other deputy was criminally responsible.**

Before turning to the candidates, it is worth asking why this record is silent in exactly the place the government needs it to speak. The answer is in the plea agreement. At paragraph 19, the parties agreed that the factual basis "is sufficient to support pleas of guilty to the charges described in this agreement *and to establish the Sentencing Guidelines factors set forth in paragraph 21 below.*" Paragraph 21 then sets out the agreed calculation: a base offense level of 12 on Count One, the six-level increase under § 2H1.1(b)(1), a base offense level of 16 on Count Two, and a combined offense level of 20. Section 3B1.1 is not among those factors.

The government drafted that document. It knew the calculation it intended to advance and wrote it into paragraph 21. It then drafted a statement of facts that both parties agreed was sufficient to establish that calculation. The defense does recognizes that paragraph 21 expressly reserves to both parties the right to argue for additional adjustments, and thus the defense raises no claim of breach. The point is evidentiary rather than contractual: a document built to carry one calculation is now being asked to carry a different and heavier one.

The drafting bears that out. Where the parties had facts about what someone knew, they pleaded them with precision. Paragraph 13 establishes that Mr.

Saavedra knew he was not authorized to access or share PII with private clients, and establishes why he did it anyway. No comparable allegation about any other deputy's knowledge appears anywhere in the thirty-one paragraphs of the factual basis. That asymmetry is not an accident of drafting. It is a document doing what paragraph 19 says it was drafted to do.

The government may point to the remainder of paragraph 19, which provides that the factual basis "is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party." That clause is a reservation, and the government has declined to exercise it. It preserved the ability to prove more and has represented that it will prove nothing more. A party that reserves the right to supplement the record and then elects not to cannot ask the Court to assume what the supplement would have contained. The Court decides on the record before it — and on that record, the candidates are these four.

**LASD Deputy 8.** This is the one place in the record where Mr. Saavedra directed a specific person. After he completed the fake search warrant, he "directed another LASD deputy, LASD Deputy 8, to print a copy of it and deliver it to Iza." Factual basis ¶ 29; PSR ¶ 42. What the record does not say is that Deputy 8 knew the warrant was fabricated, knew who Iza was, or knew what the document would be used for. Printing a document and handing it to a client at the request of the man who runs the company is not a crime. On this record Deputy 8 is an unwitting courier, and under *Cyphers* an unwitting facilitator is not a participant.

**The deputies who obtained PII.** The factual basis states that Mr. Saavedra "sometimes tasked LASD deputies working for Saavedra & Associates to secure PII for Iza," ¶ 12, and that "defendant and other LASD deputies supplied Iza with PII," ¶ 14. The same defect appears here, and it appears starkly. The factual basis is careful and specific about Mr. Saavedra's state of mind: he "knew that he was not authorized under LASD rules to access or use such PII for non-law

enforcement matters or to share it with private clients," and "did so because he wanted to impress Iza." ¶ 13. It says nothing whatever about what any other deputy knew, let alone how and from where they secured the PII. In short, the factual basis in the plea agreement does not establish that any of the deputies is criminally liable for the conspiracy between Iza and Mr. Saavedra to violate the civil rights of others with respect to the PII. It was drafted to establish *Saavedra's* individual culpability, not to show that he exercised control over others who are *also* criminally culpable.

**LASD Deputy 7.** Deputy 7 accompanied the group to Victim D.D.'s residence on December 15, 2021. Factual basis ¶ 22. The record does not say that Mr. Saavedra directed him to come, and it was Mr. Saavedra — not Deputy 7 — who identified himself as law enforcement, displayed his badge, and made the false statement about the laptop. The facts do not establish that he did this under the direction of Saavedra.

**LASD Deputies 5 and 6.** These are the deputies who held a person at gunpoint inside Iza's residence, after which Iza forced that person to transfer money to him. Factual basis ¶ 16; PSR ¶ 28. They are the most culpable deputies anywhere in this record, and the factual basis establishes that Mr. Saavedra had no authority over them at all. Their conduct preceded his involvement in it, he did not direct it, he was not present for it, and he did not know the man they held was Victim R.C. The defense has acknowledged elsewhere, and acknowledges again, that Mr. Saavedra learned of that episode and stayed anyway. But it is not evidence that he organized anyone involved in that offense.

The government's brief does not confront any of this. It asserts that Mr. Saavedra "recruited other actors, coordinated their activities, assigned them tasks, and used their status and access to accomplish the criminal objectives of the civil rights conspiracy." (ECF 62 at 13–14.) The first three of those phrases describe the

operation of a security company. The fourth is the conclusion the government needs and the one the factual basis does not supply.

**4. The organization the government describes is a lawful private security company, not the criminal activity.**

The government's role argument leads with numbers: approximately twenty to twenty-five deputies recruited, teams staffed around the clock in twelve-hour shifts, roughly $100,000 a month coming in from Iza, roughly $750 a shift going out to the guards. (ECF 62 at 12–13.) Every one of those facts describes Saavedra & Associates.

Providing bodyguards to a wealthy client is lawful. Staffing shifts is lawful. Paying guards is lawful. Nothing in the factual basis says that Mr. Saavedra recruited a single deputy to commit a crime, told any deputy what the client was, or built the company as an instrument of the conspiracy charged in Count One. The company existed to sell security, it sold security, and the criminal conduct in this case was something Mr. Saavedra did alongside it.

That distinction is built into the guideline. A defendant's role is determined "on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct)," U.S.S.G. Ch. 3, Pt. B, intro. comment. — the criminal activity, not the defendant's lawful business. Application Note 4 lists "the recruitment of accomplices" among the factors bearing on organizer status. Security guards are not accomplices. The government's brief performs a substitution: it describes the architecture of a lawful company and then calls it "the criminal conspiracy here."

Set the company aside and consider what is left of the criminal activity. Mr. Saavedra personally ran the databases. He personally called the narcotics detective. He personally swore the false affidavit. He personally drove to the neighborhood and spotted Victim E.Z. He personally drafted the fake warrant. That is a record of

a man who did these things himself. Doing the work personally is the opposite of organizing others to do it.

**5. The factual basis describes a man taking direction from Adam Iza, not a man giving it.**

Read the factual basis for who issues instructions and the direction of authority is unmistakable. Iza engaged the company. ¶ 5. Iza "asked defendant multiple times about a narcotics search warrant related to Victim R.C." ¶ 17. Iza "told defendant that he wanted to get the laptop." ¶ 21. Iza "informed defendant" that Victim D.D. might have it. ¶ 22. Iza "asked defendant to prepare a fake search warrant." ¶ 28. And then, in terms: "At Iza's direction, defendant created a fake search warrant." ¶ 29.

The motive is stated three separate times and it is the same each time: Mr. Saavedra acted "because he wanted to please Iza and to maintain Iza's business." ¶¶ 13, 18, 24. That is the psychology of a contractor protecting an account. Every criminal objective in this case originated with Iza, every target was identified by Iza, and the money that motivated the conduct came from Iza.

Application Note 4 permits more than one organizer in the same criminal activity, and the defense does not suggest otherwise. But the Note presupposes that the defendant organized someone. The person who conceived these schemes and directed their execution was the client paying the invoices.

The defense acknowledges the one paragraph that cuts the other way. In discussing Iza's frustration with his private investigator, Mr. Saavedra "volunteered that he could use his position as a law enforcement officer to obtain a search warrant" for Victim E.Z.'s phone. ¶ 24. That was initiative, it was his own idea, and it produced the worst single act in this case. The defense does not minimize it. But volunteering to commit a crime personally is not organizing another participant. If

anything it underscores the point: when something criminal needed doing, Mr. Saavedra did it himself.

**6. The criminal activity was not "otherwise extensive" within the meaning of the guideline.**

Because the adjustment fails at Application Note 2, the Court need not reach extensiveness. Should it reach the question, the showing is thin.

The government identifies three unwitting outsiders: a narcotics detective, a Superior Court judge, and the service provider that produced GPS data. (Dkt. 62 at 14.) Compare the cases it cites. *United States v. Leung*, 35 F.3d 1402, 1407 (9th Cir. 1994), involved an organization extending from Hong Kong to Los Angeles to Vancouver that imported and distributed fifty-six kilograms of heroin. *Rose* involved a corporate network employing sixty people. 20 F.3d at 374. Three professionals who acted on information given to them is not that.

There is also a counting problem. The factors the government offers as proof of extensiveness — repeated abuse of law enforcement authority, misuse of judicial process, invocation of the badge — are the same conduct already captured by the six-level increase under U.S.S.G. § 2H1.1(b)(1) for an offense committed by a public official under color of law. That six levels is the largest single component of the offense level. Counting the same abuse of office again, as evidence that the activity was extensive, inflates the range without adding information about anything the guideline is trying to measure. *See United States v. Kent*, 821 F.3d 362, 369–70 (2d Cir. 2016) (vacating a § 3B1.1(a) adjustment where the "otherwise extensive" finding rested on facts already accounted for by other enhancements).

**7. The government bears the burden, and the record is closed.**

The government bears the burden of proving by a preponderance of the evidence the facts supporting a sentencing enhancement. It has not asked for an

evidentiary hearing, has not submitted a declaration on this issue, and has represented to defense counsel that it will not introduce additional evidence at sentencing to establish the adjustment. The Probation Officer, who never received discovery in this case, PSR ¶ 12 n.1, reached the opposite conclusion on the identical facts.

The Court is thus asked to make a finding of organizer or leader status on a closed record — the same record the Probation Officer reviewed and found insufficient, and the same record the parties agreed was drafted to establish a calculation that does not include this adjustment. *See* Section 3, *supra*.

If the Court applies the adjustment, the defense respectfully requests findings under Federal Rule of Criminal Procedure 32(i)(3)(B) identifying the participant or participants the Court finds Mr. Saavedra organized or led, and the basis for concluding that those persons were criminally responsible for the commission of the offense.

**8. The sentence the defense requests.**

The defense maintains the request made in its principal sentencing position: five years of probation conditioned on twenty-four months of home detention with location monitoring, 500 hours of community service, mental health and substance abuse treatment, and restitution. The reasons for that request are set out there and are not repeated here.

On the Probation Officer's calculation, the total offense level is 17. With the five-level departure the government itself requests, the offense level is 12 and the advisory range is 10 to 16 months. On the government's calculation, the total offense level is 20, the same five-level departure produces level 15, and the advisory range is 18 to 24 months. The adjustment nearly doubles the floor of the advisory

range — from ten months to eighteen — on a finding the Probation Officer reviewed this record and declined to make.

The range is advisory, and this Court has authority to impose the sentence the defense requests whatever the arithmetic produces. *See Gall v. United States*, 552 U.S. 38, 49–50 (2007). But the advisory range remains the starting point and the benchmark against which the sentence is measured, and it should be calculated correctly before anything else is weighed. *Id.* at 49.

If the Court declines to impose probation, the defense asks in the alternative for a sentence at the low end of the correctly calculated range.

One further matter is raised only because it affects how any custodial term would actually be served. Under 18 U.S.C. § 3624(b)(1), good conduct credit is available only to a prisoner serving a term of imprisonment of more than one year. A sentence of twelve months therefore earns no good conduct credit and is served in full, while a sentence of one year and one day earns up to fifty-four days. The practical consequence is that a twelve-month sentence would require Mr. Saavedra to serve roughly fifty-three days longer than a sentence of one year and one day. The defense raises the point not to invite a longer sentence — a ten-month term, the low end of the correctly calculated range, is shorter than either — but so that the Court has the information before it if it is considering a custodial term in the vicinity of one year.

Finally, the defense notes one discrepancy for the Court's attention. The government requests restitution to the Internal Revenue Service of $90,984. (Dkt. 62 at 19.) The Presentence Report states the figure as $104,000. PSR ¶ 138. The defense does not contest the lower figure and raises the difference only so that the judgment reflects the correct amount.

## Conclusion

The government's brief describes a serious offense, and it describes it accurately. What it does not do is name one criminally responsible person Mr. Saavedra organized or led. That is what U.S.S.G. § 3B1.1(a) requires, it is what Application Note 2 says, and it is what the Ninth Circuit held in *Luca* that a sentencing court may not skip by finding the activity extensive instead. The Probation Officer applied the guideline to this record and found the adjustment did not fit. Nothing has been added to the record since.

For the foregoing reasons, the defense respectfully requests that the Court decline to apply the four-level aggravating-role adjustment, adopt the total offense level of 17 calculated in the Presentence Report, grant the government's motion for a downward departure, ECF 63, and impose the sentence requested in the defense's sentencing position.

Respectfully submitted this 13th day of September 2026.

The Law Office of Brian Gurwitz, APC

/s/

Brian N. Gurwitz
Counsel for Eric Chase Saavedra